Thank you, Your Honor. Good morning. May I please discuss court? The main issue in four lying case are the IJs and BIA adverse credibility determination as well as a finding that petitioner failed to submit corroborating evidence. Petitioner applied for asylum withholding of removal and relief under the Convention Against Torture in August of 2008. An order of removal was issued by the IJ on August 13, 2009. Petitioner's case, therefore, is subject to the Real ID Act, enacted on May 11, 2005, with regards to credibility determinations and requirement to submit corroborating evidence. The BIA affirming the IJs' adverse credibility determination relied on three distinct reasons, and I will address each of these reasons separately. As laid out by this honorable court in Schrester v. Holder and Wren v. Holder, under the Real ID Act, a credibility determination is made on the basis of the totality of circumstances and all relevant factors. Credibility determination under the Real ID Act must be reasonable. Can I say one thing? I'm sure you know this, but reading your talk is we really can't hear it that way. If there's any way you can not do it, it would be better. Yeah, I can do that less. Under the Real ID Act, the totality of the circumstances need to be considered and the individual circumstances of an applicant for removal. The IJ first held that Petitioner was not credible because of alleged inconsistency about the timing and manner of the torture he suffered during his 2005 arrest. This was the first reason why they affirmed the adverse credibility determination. Why was that determination not supported by substantial evidence? When we review the administrative record very detailed, it becomes apparent that on various occasions the government counsel misstated Petitioner's prior testimony and thereby misled and confused the Petitioner when answering the question subsequently. Also, this Court's ---- An example of that? I'm sorry? Do you have an example of that problem? Yes. It's when he talked about his 2005 arrest, he states on administrative record, page 192 to 193, that on the first day he was beaten with belts and sticked, slept, punched, and hung upside down from the ceiling. On the second day, and we don't know if he talks about the second day he was tortured or the second day he was detained during his 2005 arrest, he states that he was also tortured by having a roller applied to his body. On cross-examination, the government counsel asked whether the roller was used to torture him on the first day, and he clearly states no. And then the government counsel says, so now you're changing your story. And that is at the administrative record as well. I don't know if we agree that the immigration judge was overly picky in terms of his about his credibility and whether there were inconsistencies. He says that he could have obtained more supporting affidavits. Why didn't he? And he had many months to do it. Actually, I wanted to get to that point in a few minutes. Could I just finish something up with regards to the credibility? Yes. Because with regards to the torture issues in the 2005 arrest, the court in Wren v. Holder had basically held that if there's a perceived inconsistency with regards to the timing and manner of torture, that's actually understandable because a torture victim might be confused, might not remember everything. And in Wren, it was actually a very similar scenario where Wren testified originally that he was tortured in a certain way during the third day and then was retrieved on the second day. The asserted inconsistencies were pretty much timing. Was there anything besides timing? It was whether it was the first day, the second day, what was before, what. That's right. And I would just say under the Wren v. Holder. But there was also a great skepticism about the notion that he could have been hanging upside down for three hours and not become unconscious, right? But that would be speculation, which under the Ninth Circuit is not allowed. And that leads me back to the question Your Honor had with regards to cooperating evidence. Well, under the real idea, plausibility of testimony can be considered. That is correct. But the IAG under the Ninth Circuit is still not allowed to speculate with regards to if Petitioner really was not unconscious for three hours. I mean, when he was tortured, he might not have a full concept of time. So it's still a speculation with regards to for how long did he really hang down before he lost consciousness. But with regards to the cooperating evidence, during the very first court hearing Petitioner testified, which was in January of 2009, Petitioner actually had requested a continuance to obtain corroborating evidence because he had requested the case to remain on fast track. And because the master hearing was only two weeks before, he wasn't able to obtain the first court hearing on January 29th, 2009. And at the outset of the hearing, the IAG didn't want to grant a request for a continuance, but rather said she would defer the decision until she had taken some testimonies at least. Towards the end of the hearing, as the administrative record reveals on page 208, the judge actually encourages the government counsel to ask for a continuance because she would like government counsel to submit some independent evidence about how long a person can actually be hung upside down before losing consciousness and also how ROLA usually is applied. So government counsel at that time was encouraged to seek the continuance for corroborating evidence. Under the Real ID Act, from my research, the IAG has to follow a specific guideline. If IAG determines first whether an applicant's testimony is credible, and if it's credible, if it's by itself meets the burden of proof to establish persecution or allege persecution and danger to life. If the evidence does, then no corroborative evidence is required. If a credible applicant has not met this burden of proof, then the IAG to give notice is required. Ginsburg. The Real ID Act, there was more permissiveness in that, in terms of asking for the corroborating evidence. The real issue that's originated in our case law has to do with notice, right? But here, I mean, there was notice, was there not? No, there was no notice. That's what I would like to argue because during the first hearing, the judge asked for, okay, we asked to have time to submit corroborating evidence, and the judge only at the end when she wanted corroborating evidence from government agreed to a continuance. At that point, she did not have notice that you needed to corroborate evidence. Yes, but I think she was supposed to address the issue of credibility. I mean, under the Real ID Act, from the case law that we're getting that part from. Actually, from the government ---- I thought that was more the pre-Real ID Act. No. Actually, under Levy-Holder and under the Levy-Holder case, which the government submitted, cites Wren v. Holder and also Zee v. Holder. And in that case, in Wren, of course, the court talks about a notice and opportunity requirement if an applicant is found credible. And then later in Zee v. Holder, the applicant ---- I mean, the court held that if we find the applicant credible because we find that there wasn't substantial evidence to find him not credible, then there should have been noticed an opportunity to provide evidence. First of all, I would argue that my client, Petitioner, was credible and that there was not substantive evidence to find him not credible because the inconsistency with regards to the torture under Wren v. Holder were not material, but rather trivial. Didn't she find other things, though, as well? I mean, she said that partly his demeanor, and I don't know, can we ---- can we possibly review that? I don't really think so, right? And part of it was that in asking why he took so long to leave that he really hesitated and took a long time to answer. I would argue that under the real idea, since we need to look at the totality of the circumstance, so we need to look also at the fact that this was at the end of testimony, three-hour testimony. Overwhelmingly, if we look at the record, the Petitioner gave consistent and detailed testimony up to the point he talked about the torture, and then towards the end of the testimony, he didn't answer any of the questions anymore, he appeared to be exhausted. At the administrative record, it clearly reveals that he was more hesitant of giving ---- answering questions. And I think it's totality of the circumstances. If we look at it, we need to take these things into consideration, that Petitioner will eventually probably get a breaking point and not be able to recall every single answer. But he didn't take so long to leave if he was really worried about torture. I think he stated on direct and he repeated that on cross-examination that he felt he needed to be there for his dad to help him. And after his second arrest where he suffered more severe torture in 2005, that's when he really started fearing for his life. But he didn't leave for years. He didn't leave right away because his ---- but I think under the Ninth Circuit, that doesn't mean that he is not credible and that his claim is not a true claim. It just means that he had certain circumstances which required him to remain in this country. And then the cert time, when they attempted to question him, then he really realized, hey, they threatened me, cert time will be the end and I will be killed. And that's when he decided to leave. Ginsburg. Can we go back to your point about corroboration in the Real ID Act? I'm still trying to ---- I looked at Wren. Wren doesn't seem to have the point that you mentioned. It doesn't ---- I had thought that the Real ID Act provided, allowed corroboration whenever the I.J. wanted corroboration, essentially. But Wren does require a notice and opportunity requirement. Yes, that's right. I understand that. And you said something else. You said that there was that unless there was a determination of lack of credibility or something that you ---- No, no, no. I was trying to explain that under Wren, of course, notice and requirement for applicants which are deemed to be credible, and then there should be a notice and requirement to submit. Well, if they're already credible, then there's no need for corroboration. But if he hasn't met the burden of proof under the Real ID Act, the I.J. can still request corroborating notice. Where are you getting the fact that they can't simply ask for corroboration with regard to the credibility issue if they want to? According to Wren, there is a sequential determination. And that's not what Wren says. Wren says, yes, you can ask for it, but you'd need to give notice. But it does state that they have to follow a particular step with regards to Wren corroborating. Well, I don't see it. Okay. Go on. I can maybe cite to this case. I have it. So you're over your time. Yes. Thank you. Thank you. I'll give you a minute, Roberta. Good morning, Your Honors. May it please the Court. I'm Fred Sheffield on behalf of the Attorney General. We're asking that you deny this petition for review because Petitioner has not shown that this record compels the conclusion that he was credible in testifying about his alleged persecution claim from India. The immigration judge's adverse credibility determination, as affirmed by the Board, was well-supported primarily by two factors, internal inconsistencies in Petitioner's testimony, and second, a finding that Petitioner was repeatedly unresponsive and exhibited a demeanor such that he was not credible throughout the hearing. I want to first just touch on Judge Booklew's concern about demeanor. As per the Real ID Act, which this case is governed by, there's no question about that, the trier of fact may base a credibility determination on demeanor, candor, or responsiveness of the applicant witness. So there's no question that demeanor is something that an immigration judge can consider. I think what's important for this Court is how does the Court review a demeanor finding, because an immigration judge's demeanor findings still need to be well-supported by the record. Well, I think Ling Huang, the case that we sent in the 28J just recently, answers that question very well. And that is when an immigration judge has concerns about demeanor, it's very helpful for the Board and for this Court on review. It's important for the immigration judge to note instances in the record explicitly where there are concerns about demeanor. And in this record, we have numerous, numerous examples where Petitioner was unresponsive and the immigration judge cited these, as did the Board. Right there at the top of the, I think it's the second page of the Board's decision. Actually, it's the bottom of the first page of the Board's decision. The immigration judge, for example, noted several long pauses in Petitioner's hearing, instances where Petitioner was not listening to questions. I would also just, the Board noted about five or six specific instances. I would also just encourage the Court to look at some other instances, basically running from administrative record 250 to about 265. In those 15 pages, we see numerous examples of the immigration judge specifically telling Petitioner, I'm having difficulty understanding you. You seem to be trying on answers for size. You seem to be mumbling. These are all the types of discussions that, based on Ling-Huang, support a valid, adverse credibility decision based in part on demeanor. Well, Counsel, we cannot consider any reasons that were not considered by the Board, can we? Well, what's important is that the Petitioner's case must show that the record compels the conclusion that she was credible. And in that sense, this Court is looking at the entire range of the entire record. So in the sense that, I mean, in reviewing this record, it's about 150, 200 pages worth of testimony. It's a lot of testimony, and the Board certainly relied in part on the immigration judge's demeanor finding, and it listed about six specific instances. When I went through the record, I could find about, you know, a dozen more. But are we permitted to do that, to go through the record and add to the reasons that the BIA articulated for its decision? Well, I think there's a decision from this Court called Morgan. It's at 529 Fed 3rd 1202, and that notes that where we're reviewing an adverse credibility decision, it's the immigration judge's decision that's really under review, and the examples that the Board cited are the same. No, that depends. It depends on how the BIA reviewed the IJ, right? Correct. Right. But what is it that the – I guess I lost your thread here. What is it that you're now relying on that's not in the BIA? The BIA does rely on the demeanor issues. Right. And specifically for that purpose relies on the IJ. The IJ's observation of the Respondent's demeanor, including his unexplained, evasive, confused, and unresponsive manner, supports his adverse credibility determination. So on that, they were specifically relying on the IJ. Right. I was also just noting, I mean, the Board listed about five or six examples, and my point was simply to say that there are – I mean, if we look at the record as a whole, and that's what this – that's what this Court's review is based on, whether the record as a whole – Well, I don't think that's true in general, but in this circumstance, it seems to me that they were relying on the – that they were relying on the entire record. But I don't think it's true in general that we can go manufacture – I mean, for example, if they come up with inconsistencies, we can't come up with other inconsistencies. No. What if it goes the other way? I mean, I've read the transcript twice, and I actually thought the immigration judge was a bit of a bully. At least it came across that way to me. I mean, some of these inconsistencies that the immigration judge was relying on seemed to me to be trivial, and indeed, one of those inconsistencies about a day, the government then got wrong and said, oh, well, that's – it's a minor inconsistency as to – I mean, how does somebody remember exactly which day they were beaten and how badly they were beaten? That seems to me to be a poor reason for saying that somebody wasn't beaten and didn't suffer persecution. I'm more concerned with – but there is the issue of whether he really took a long, long time to answer when he should have. Now, how about counsel's suggestion that really this took place at the end of the hearing when I can imagine that he was very tired? And there seems to have been a language issue there, too, which, of course, could explain a lot of this. Or is your answer just that, well, we can't look at that? Well, interpretation is not something that we can look at because it's never been raised. It wasn't raised in the hearing. Petitioner was even asked, are you having difficulty understanding the interpreter at one point, and said – and responded terminally, I can understand the interpreter. I don't know that I ever see a point in the record where interpretation was raised as an issue. So I don't think we can look at that. As for the inconsistency, the primary one that the Board relied on, which was the timing of how the sequence played out in 2005 when he was detained. I mean, I think it's important to go – to look specifically at how this inconsistency emerged. Petitioner was asked first on direct examination, when did this occur? When did the hanging occur? He didn't respond, I don't know. He didn't express any hesitation. He didn't say, I'm having difficulty remembering. He said, it was the third day. Later in cross-examination, he then mentioned that the hanging incident occurred on the second day. But he initially was asked a simple question, when were you hung upside down the first day? That's at AR 174, line 11 through 5. And then I think the most important part of this inconsistency is that later on in the day, he's asked – so we've talked – because he was then discussing his first day of being detained, his second day of being detained. He's asked, so we've talked about the first day and the second day. Were you physically mistreated on the third day? And at this point, he says, nothing happened to me on the third day. So that's – that's the thing that I think was most troubling to the immigration judge, is there was a very clear instance when he said, without prompting, what happened – when were you hung upside down? His response, the third day. Later on cross-examination, I wasn't – nothing happened to me on the third day. And I think it's important to look at this inconsistency in the context of the broader – the broader credibility concerns identified by the immigration judge. And again, this is where I would emphasize the Court to look to Lin Huang. This isn't an inconsistency in the mode of Wren, where this is someone who's testifying in an otherwise credible manner and there are no questions about demeanor or responsiveness. This is – this type of inconsistency, I would submit, is really the tip of the iceberg in this case. There were far more instances where this individual was mixing up answers, telling inconsistent responses than consistent responses. And, I mean, the immigration judge made an effort to go through as many as she could point out, and the Board also highlighted some. But it was really evasiveness. Things as simple as, what's his address? Petitioner was asked, what's his address? And the response to that first was 100 Cambridge Avenue. And he went on to describe what the apartment was like at 100 Cambridge Avenue. And it was only when government's counsel said, isn't Cambridge Avenue actually a motel? Again, long pauses, and Petitioner responds, well, yes, it's actually a motel. Now, this doesn't seem like something that's central to Petitioner's claim, but, again, this is a Real ID Act credibility determination. And under the Real ID Act, the immigration judge is entitled to look at the totality of the circumstances, whether these issues go to the heart of the claim. I see my time has expired. If Your Honors have any further questions, I'd be happy to answer them. That's fine. Thank you. Subject to the Court's questions, then we would just ask that the Court deny this petition for review. Thank you. Thank you. I'll give you one minute in rebuttal. I actually wanted to go back to what counsel just stated with regards to the date, time, and manner of torture. Just very quick, in Renby Holder, the Court relied on a ruling of a case called Singley-Gonzalez, where he said we have previously recognized that victim of abuse often confused the details of a particular incident, including the time, dates of particular assaults, and which specific action occurred on which date. There were other issues. I mean, I tend to agree with Judge Buckler that the inconsistencies regarding the incidents themselves were fairly trivial. But there were other things that may not have gone to the persecution itself, like, for example, when did he get his birth certificate from his father, and what was his address, and when he left, and the explanation for why he left India when he did, and all of which the Board treated really as more demeanor issues. And the question is, why isn't that sufficient, the fact that he, in general, just seemed to be wandering all over the place? I would argue that the Board only mentioned these three. Yes, he mentioned demeanor, but demeanor with regards to supposedly evasive answers and pauses. And like I stated earlier, I think if we really look at the administrative record, it occurred towards the end. He stated at one point that he wasn't feeling good, and he had made that statement at the outset of the hearing, but he wanted to go ahead and testify. With regards to the address, what counsel was referring to, he did provide a reasonable explanation for it. He basically said, yes, he lived with an uncle and family at an apartment, but he goes to the motel at daytime, and uncle stayed at the motel. It's a peculiar thing to say. If somebody asks you what your address is, you give the place where you are during the day, not where you live. He basically said uncle instructed him to give this particular address. He did not even know the address of the apartment. It was more a reason, I think, uncle told, hey, say you live there because we get mail there, you hang out there all day, so that's the address you're giving. That's what he testified to with regards to that. He provided to my somewhat reasonable explanation for why he gave that particular address. Okay. Your time is up. Thank you. Thank you, Your Honor. The case of Patel v. Holter is submitted, and we will go on to United States v. Haddock.
judges: Bucklo, Berzon, Rawlinson